Hill Design v. Vivian Hodgdon, et al. CV-03-074-M   04/07/03  P
**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Hill Design, Inc.

v.                                    Civil No. 03-074-M
                                      Opinion No. 2003 DNH 059
Vivian Hodgdon, et al.


**REPORT AND RECOMMENDATION**

The plaintiff, Hill Design, Inc., ("Plaintiff" or "HDI"),

commenced this action against defendants Vivian Hodgdon

("Hodgdon"), Art In Cooking, Inc. ("AIC"), Patricia Carpenter

("Carpenter"), and The Garden Shed, LLC.  Plaintiff alleges in

the Verified Complaint that each of the defendants have committed

copyright infringement, trademark infringement, and unfair and

deceptive acts.  Plaintiff further alleges, among other things,

that Hodgdon and Carpenter committed unlawful conversion.

Plaintiff filed a motion seeking a preliminary injunction

against defendants Hodgdon and AIC with the complaint.  In its

motion, Plaintiff seeks an order enjoining Hodgdon and AIC, from

(1) distributing, circulating, selling, offering for sale,

advertising, promoting or displaying any BROWN BAG cookie mold,

shortbread pan or recipe booklet; and (2) imitating, copying, or

making unauthorized use or distributions of the BROWN BAG cookie

molds, shortbread pans, and recipe booklets.  Plaintiff also

seeks an order requiring Hodgdon and AIC to provide an accounting of all gains, profits and advantages derived by defendants through their sale of BROWN BAG cookie molds, shortbread pans and recipe booklets since April 11, 2002.

Plaintiff's motion was referred to me for review and to prepare a report and recommendation (document no. 4). The Court held an evidentiary hearing over parts of two days concluding on March 26, 2003. Plaintiff submitted a supplemental memorandum in support of its motion on March 28, 2003. After considering the testimony of the witnesses, exhibits admitted into evidence, and the relevant authorities, I recommend that the Plaintiff be granted limited injunctive relief as discussed herein.

BACKGROUND

A.   The Parties

HDI is a New Hampshire corporation with a principal place of business in Hill, New Hampshire. HDI has been in business for over twenty-five years and manufactures, wholesales, and retails high-end house and garden products. Paul Natkiel is the president and chief executive officer of HDI, and a shareholder. Lucianna Ross Natkiel ("Lucy Natkiel") is HDI's vice-president and an HDI shareholder. Paul and Lucy Natkiel are married.

2

Defendant Hodgdon resides in Danbury, New Hampshire. She worked for HDI as a warehouse and distribution employee for ten years until late 2001 when she was laid off. In January 2002, Hodgdon founded AIC as a sole proprietorship with a principal place of business in Danbury. AIC was incorporated in New Hampshire on April 16, 2002. Df. Ex. K.[1]

Defendant Carpenter resides in Pittsfield, New Hampshire. In December 2001, Carpenter founded The Garden Shed as a sole proprietorship located in Pittsfield. The Garden Shed was incorporated as a New Hampshire limited liability corporation on October 8, 2002. Df. Ex. PC-2. Although Plaintiff did not move for a preliminary injunction against Carpenter and The Garden Shed, Hodgdon called Carpenter as a witness at the hearing.

B.    HDI Background

HDI sells copyright protected high-end house and garden products under registered and unregistered BROWN BAG trademarks ("BROWN BAG"), including cookie molds, shortbread pans, and recipe booklets. Lucy Natkiel is the creator and artistic designer of the BROWN BAG products. She created her first cookie mold for HDI's BROWN BAG line in 1983. Lucy Natkiel has designed

_____

[1]All references to exhibits refer to the exhibits admitted into evidence at the preliminary injunction hearing.

over 250 BROWN BAG molds for HDI of which 150 are registered with the United States Copyright Office.

In the second half of 2001 and the first half of 2002, HDI went into serious financial difficulty and was forced to reorganize, lay off scores of workers, sell product lines at fire-sale prices, and close a large office and warehouse in Concord, New Hampshire. However, HDI still owns a production facility and warehouse located in Hill, New Hampshire (the "Hill facility"). The Hill facility has a commercial pottery containing highly specialized and expensive equipment, including commercial kilns, distillation equipment, agitators, and other ceramic-specific equipment. The Hill facility also has a warehouse that HDI uses to prepare and ship orders. Hodgdon contends that HDI ceased operations and abandoned its assets to its creditors on October 14, 2001, but Paul Natkiel testified that HDI has been in continual existence.

C. The HDI Auction

The inventory at HDI's Concord facility was sold at an auction in late 2001. The auction was conducted as a "piece plus whole auction." The auctioneers put individual pieces up for bids, and then they put up entire lots for bid. If the sum of

4

the bids on individual pieces was less than the bid for an entire lot, the person who bid for the entire lot won the auction.

Hodgdon assisted HDI with the auction and bid on some of the items. See Df. Ex. B.[2] Carpenter testified that she and Hodgdon met for the first time at the auction. Hodgdon helped Carpenter load her truck when the auction was over.

Carpenter testified that she has acquired over 10,000 HDI items through public and private sales, including thousands of cookie molds, garden pots, plant stakes and books. Carpenter purchased some lots from Roger Slate, a bidder who had obtained approximately 75 percent of the available HDI inventory. Carpenter purchased other items from Ralph Language, another successful bidder. Carpenter acquired other HDI items from various Christmas Tree Shops.

D. The Natkiels Train Hodgdon at the Hill Facility

At some point in late 2001, Paul Natkiel and Hodgdon discussed Hodgdon's love of the BROWN BAG product line and their mutual disappointment that HDI was going out of business. Both

---

[2]Defendant's Exhibit B includes documents that refer to Hodgdon's purchase of the following items at the auction: Wood Shelving with Contents-Ass't Packaging Labels/Tools; Assorted Computer Components; Weber Legitronic Label Printer with Stand, etc.; middle of one lot (#314).

Hodgdon and Paul Natkiel believed that a market still existed for the BROWN BAG product line. Thereafter, Hodgdon and the Natkiels explored the possibility of Hodgdon opening her own business manufacturing and distributing licensed BROWN BAG products. The Natkiels trained Hodgdon at the Hill facility in the mixing of clay, pouring and casting, and finishing of cookie molds in contemplation of Hodgdon opening up her own production and distribution business for BROWN BAG products.

With the Natkiels' assistance, Hodgdon began making BROWN BAG products before any written license agreement was executed between Hodgdon and the Natkiels or HDI. The Natkiels fired the first two production runs of cookie molds for Hodgdon's business, which Hodgdon testified resulted primarily in a financial loss to her because the items produced were of poor quality. Hodgdon claims that she then taught herself to fire molds at the Hill facility without further assistance from the Natkiels.

Hodgdon contends that when she produced BROWN BAG products at the Hill facility, she paid for the electricity, she bought the clay, and she supplied the labor. Hodgdon also paid for repairs needed at the Hill facility. Hodgdon claims that she made this investment in order to supply AIC's inventory under an

6

oral agreement with the Natkiels.

E.     Business Negotiations Breakdown

Plaintiff alleges that the parties contemplated that Hodgdon would conduct an independent business under a written license agreement with Plaintiff that would give Hodgdon the right to use certain of Plaintiff's copyrights and trademarks.  Paul Natkiel drafted proposed license agreements and sent those drafts to Hodgdon.[3]  It is undisputed that the Natkiels and Hodgdon negotiated certain terms of the proposed license agreement including the amount of royalties that Hodgdon was expected to pay, and the length of the agreement.  Paul and Lucy Natkiel testified that they made several concessions to Hodgdon during these negotiations.

On or about April 11, 2002, the parties' business relationship fell apart.  Plaintiff alleges that the Natkiels ended negotiations for three reasons: (1) it became clear that

_____

[3]The copies of the draft license agreement entered into evidence state that the agreement is between Paul and Lucy Natkiel and Vivian Hodgdon.  HDI is not listed as a party.  See Pl. Ex. 23; Df. Ex. H, I.  The agreement purports to grant Hodgdon a license "to make or to purchase, and also to market current and future Brown Bag Cookie Art or Brown Bag Designs ceramic cookie and shortbread pan products, and to use the Brown Bag Cookie Art and Brown Bag."  Pl. Ex. 23, ¶ 7; Df. Ex. H, ¶ 7; Df. Ex. I, ¶ 7.

7

Hodgdon had no intention of signing a license agreement and sought to market HDI's products on her own; (2) Hodgdon's lawyer contacted a major HDI creditor without legitimate reason; and (3) Hodgdon's husband threatened to sue the Natkiels if Hodgdon got hurt in the course of the parties' business relationship. Lucy Natkiel testified that she informed Hodgdon in a face-to-face meeting on or about April 11, 2002 that the Natkiels did not want to go forward with negotiations citing the threat from Hodgdon's husband to sue even before there was a written contract.

Hodgdon testified that on the morning of April 11, 2002 her attorney told her that Lucy Natkiel had "pulled the rug" on the deal. Hodgdon contended that the break down occurred because Hodgdon's attorney sought to protect Hodgdon's interests. Lucy Natkiel admitted during cross-examination that she told Hodgdon that there would be no further business dealings if Hodgdon or her attorney contacted HDI's major creditor to request the creditor's permission to use HDI's copyrights. At that time, HDI was in negotiations with the creditor and the creditor had not chosen to exercise its rights against HDI's copyrights. Lucy Natkiel was concerned that the creditor would try to obtain more from the Natkiels in a settlement if the creditor believed that a

8

third party was interested in the copyrights. Lucy Natkiel later learned in a conversation with Hodgdon's attorney, however, that the attorney had spoken with HDI's creditor. Lucy Natkiel testified that on the morning that she told Hodgdon's attorney that she wanted to call off the deal she and the attorney had argued about the renewal terms in the draft license agreement.

F. <u>Hodgdon Removes Items From the Hill Facility</u>

Shortly after Hodgdon vacated the Hill facility, the Natkiels learned that Hodgdon had taken scores of items with her. Paul Natkiel testified that his investigation revealed that the items taken included cookie molds, shortbread pans, cookie mold packaging materials, cookie and shortbread recipe books, plaster molds, and liquid clay. Hodgdon also removed mixing equipment, kilns, a computer laptop, printer, and handtools. With the assistance of attorneys, Hodgdon agreed to return certain of the items that she took from the Hill facility. Paul Natkiel testified that some items that should have been returned, including pouring molds, were not returned.

Hodgdon admits that on April 16, 2002, after Lucy Natkiel asked her to vacate the Hill facility, Hodgdon took numerous items from the site including approximately half, in monetary

9

value, of an inventory purchased by Ms. Helen Ross. Defendant Carpenter assisted Hodgdon with removing items from the Hill facility and bringing them to Hodgdon's home in Danbury.

Hodgdon claims that she took the items from the Hill facility on the advice of her attorney. Hodgdon disputes that she failed to return the pouring molds and other items that Paul Natkiel claims are still missing, although Hodgdon claims that she did overlook about one hundred pieces. Hodgdon contends that the Hill facility was not secure at the time that she worked there and that several other persons who visited the site had access to the equipment and inventory.

To fully understand Hodgdon's contentions, it is necessary to discuss in more detail the items that Hodgdon took from the Hill facility that were purchased by Ms. Helen Ross. Helen Ross is Lucy Natkiel's sister. The evidence shows that Ms. Ross purchased three trailer loads of HDI's Concord inventory prior to the HDI auction (hereinafter "the Helen Ross Inventory"). See Df. Ex. A (Hill Design Order Form). Hodgdon testified that the Helen Ross Inventory consisted of items that Hodgdon picked out while employed by HDI with the idea of trying to save the BROWN BAG line. Hodgdon testified that she later asked Paul Natkiel if

10

she could purchase the inventory, but he would not allow it. That inventory was sold to Helen Ross. Hodgdon and others loaded the inventory into trailers for transport to the Hill facility. Hodgdon testified that Paul Natkiel led her to believe that Ms. Ross purchased the inventory on Hodgdon's behalf, although the sale was documented as a purchase for an entity named "Cookie Art Exchange." See Df. Ex. A.[4]

Hodgdon contends that Paul Natkiel encouraged her to distribute the items in the Helen Ross Inventory and to collect the proceeds through AIC. The evidence shows that Hodgdon communicated with former HDI customers regarding orders for BROWN BAG products as early as January 2002. See Df. Ex. E (Fax from Vivian Hodgdon on AIC Cover Sheet). Hodgdon testified that Paul Natkiel directed those customers to her, and promised the

---

[4]The Plaintiff alleges in the Verified Complaint that HDI held goods in storage for the benefit of a third party and agreed to sell the products with a portion of the proceeds to go to the third party. See Ver. Compl. at 10-11 n.1. The evidence presented at the injunction hearing contradicted this characterization at least with respect to the Helen Ross Inventory. The Court finds the record unclear as to the circumstances of the purchase of the Helen Ross Inventory and its intended disposition since the items were nominally purchased by and for non-parties who did not testify. See Df. Ex. A.

11

customers that AIC would fill their orders.[5]

Carpenter's testimony supports Hodgdon's contentions. Carpenter testified that she contacted Paul Natkiel some time after the HDI auction to learn whether HDI had any additional inventory that she could purchase. Carpenter later arranged to visit the Hill facility. During that visit, Carpenter offered to purchase $400 to $500 worth of items. Paul Natkiel instructed Carpenter to write her check out to Hodgdon. According to Carpenter, Paul Natkiel stated that he was helping Hodgdon out and that no money should go through his hands. Carpenter testified that she also engaged in a conversation with Paul Natkiel about possibly making an investment in AIC. Paul Natkiel represented to Carpenter that the inventory at the Hill facility belonged to AIC and that AIC had sufficient inventory to serve as collateral for a $100,000 investment.

Hodgdon testified that her attorney led her to believe that she was authorized to sell the Helen Ross Inventory even after

---

[5]Plaintiff alleged in the complaint that the Natkiels repeatedly told Hodgdon that Hodgdon would not be permitted to produce, distribute, or sell HDI's copyright protected cookie molds, recipe booklets, or shortbread pans or use HDI's BROWN BAG trademarks absent a written license agreement. Ver. Compl. ¶ 27-28. Plaintiff admits, however, that Hodgdon's sales prior to April 11, 2002 were authorized. Ver. Compl., ¶ 41.

12

Lucy Natkiel told her to vacate the Hill facility. According to Hodgdon, her attorney advised her that she could "take what you need to get yourself on your feet." Hodgdon testified that it was her belief, after her conversations with her attorney and Lucy Natkiel, that the business deal had been put on hold pending completion of HDI's settlement with its creditor.[6]

Some time after Hodgdon vacated the Hill facility, Hodgdon received a phone call from an unidentified person seeking the return of the Helen Ross Inventory. Hodgdon then received a letter seeking the return of the inventory from Ms. Ross. Hodgdon prepared a handwritten inventory and returned items that she took from the Hill facility on or about May 6, 2002. See Pl. Ex. 4. Hodgdon testified that she only intentionally retained items that she purchased for AIC, items that she had produced at the Hill facility with her own labor and at her own expense, and items from the Helen Ross Inventory needed to fill pending

---

[6]The Court finds this testimony suspect in light of the conflicting testimony regarding whether Hodgdon attempted to pay the Natkiels approximately $15,000 for the Helen Ross Inventory immediately after taking it from the Hill facility. Lucy Natkiel testified that Hodgdon visited the Natkiels' home, told Lucy Natkiel that she had taken the inventory, and asked the Natkiels to accept a check. Lucy Natkiel refused. Hodgdon denied that this encounter took place, but later seemed to defend the offer for the inventory as reasonable because Helen Ross had paid only $5,000 for it.

orders.  Hodgdon testified that she continued to fill orders that were placed by HDI's former customers after April 11, 2002 because Paul Natkiel had promised those customers before April 11, 2002 that their orders would be filled.

G.    Hodgdon's Sales of BROWN BAG Products

Plaintiff contends that Hodgdon's sales of BROWN BAG products after the Natkiels terminated the business relationship infringed on Plaintiff's copyrights and trademarks.  See Ver. Compl., ¶ 41.  Hodgdon sold three categories of BROWN BAG products after her business relationship with the Natkiels ended: (1) items from her personal collection of BROWN BAG products acquired while she was an HDI employee; (2) items Hodgdon made at the Hill facility; and (3) items from the Helen Ross Inventory.

Hodgdon placed stickers on the backs of the cookie molds that she made at the Hill facility.  The stickers on the cookie molds state: "HANDCAST BY Art In Cooking."  See, e.g., Pl. Ex. 19.  Hodgdon also placed stickers on a recipe booklets attached to the molds.  The stickers on the recipe booklets state:

Distributed by:
Art In Cooking, Inc.
PO Box 163
Danbury, NH 03230
artincooking.com

14

See Pl. Ex. 19.  Imprinted copyright notices are clearly visible on the backs of the cookie molds made by Hodgdon notwithstanding the placement of the "HANDCAST By Art in Cooking" stickers.  See Pl. Ex. 18-21.  However, Hodgdon's stickers completely cover the copyright notice on the back of the recipe booklets.  The covered copyright notice states:

> (c) 1995 Hill Design, Inc., Concord, NH 03301
> All rights reserved.  Brown Bag Cookie Art is a
> registered trademark of Hill Design, Inc.  All products
> are copyrighted and sold specifically for private use
> only.  All commercial uses of Hill Design products
> involving reproduction of imagery or duplication of
> products are prohibited unless specifically licensed in
> writing from the copyright owner.

See Pl. Ex. 17.  Paul Natkiel testified that HDI did not authorize the placement of any of the stickers used by Hodgdon. He further testified that neither HDI nor the Natkiels have received any royalty payments from Hodgdon for her sales after the parties' business relationship broke down.  In response, Hodgdon testified that she discussed placing stickers on the items she cast with the Natkiels.  And Hodgdon claimed that she was well aware that she owed royalties for her sales of BROWN BAG products.  Hodgdon claims that she was unclear to whom royalties should be paid in light of the lien on HDI's assets, and the Natkiels' refusal to cash checks that she sent to them.

15

H.    Plaintiff's Attempts to Halt Defendant's Sales

Plaintiff later learned that Hodgdon was offering BROWN BAG products for sale to some of HDI's former customers and to the public on eBay, an Internet website that facilitates on-line auctions. The Plaintiff submitted evidence showing that Hodgdon sold BROWN BAG items to at least three individuals after April 11, 2002: Maureen Daly, Suzanne Sicard, and George Nemcosky.

The evidence showed that Hodgdon began listing BROWN BAG items for sale on eBay beginning in July 2002 with her last listing appearing as recently as February 2003. Plaintiff complained to its former customers and to eBay claiming that Hodgdon was infringing its copyrights and trademarks. eBay immediately removed Hodgdon's auction listings.

Hodgdon testified that the only former HDI customers to whom she sold BROWN BAG items were customers who were directed to her by Paul Natkiel. Hodgdon further testified that the items that she listed on eBay were items from her personal collection and items that she made at the Hill facility.

DISCUSSION

A.    Standard of Review

"The purpose of a preliminary injunction is to preserve the

16

status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc., 48 F.3d 618, 620 (1st Cir. 1995) (citing Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal., 840 F.2d 701, 704 (9th Cir. 1988); American Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)).  Thus, if the court ultimately finds for the movant, a preliminary injunction provides the court with a method for preventing or minimizing any current or future wrongs caused by the defendant.  CMM Cable Rep., 48 F.3d at 620.

A court may grant a plaintiff's request for a preliminary injunction if the plaintiff can satisfy a four-part test: (1) the plaintiff will suffer irreparable harm if the injunction is not granted; (2) a likelihood of success on the merits; (3) that such injury outweighs any harm which granting the injunction would inflict on the defendant; and (4) that the public interest will not be adversely affected by the granting of the injunction. Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989), quoting Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981).  The key issue in determining whether injunctive relief should be granted is

17

whether the plaintiff can demonstrate a likelihood of success on the merits. Equine Tech., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 (1st Cir. 1995)(the central issue in most preliminary injunction trademark cases is whether plaintiff has demonstrated a likelihood of success on the merits); Weaver v. Henderson, 984 F.2d 11 (1st Cir. 1993) (plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will usually not obtain interim injunctive relief).

B.    Likelihood of Success on the Merits

    1. Copyright and Trademark Infringement

    To succeed in an action for copyright infringement, the plaintiff must establish the following elements: (1) ownership of a valid copyright, and (2) unauthorized copying of constituent elements of the copyrighted work. Feist Publ'n v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991); see also, Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 813 (1st Cir. 1995); Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1114 (1st Cir. 1994). To succeed in an action for trademark infringement, the plaintiff must establish following elements: (1) that it uses and thereby owns the mark; (2) that the defendant is using the same or a similar mark; and (3) that the defendant's use is

18

likely to confuse the public, thereby harming the plaintiff. Star Fin. Serv., Inc. v. AAStar Mortg. Corp., 89 F.3d 5, 9 (1st Cir. 1996); DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605 (1st Cir. 1992).  As with copyright infringement, the plaintiff must show that the defendant's use of the plaintiff's mark was unauthorized.  See 15 U.S.C. § 1114.

The Court determines, after reviewing the testimony and documentary evidence, that the Plaintiff has not demonstrated that it is likely to succeed on the merits on its infringement claims.  There is no dispute that HDI owns numerous copyright protected products sold under federally registered and unregistered BROWN BAG trademarks, including cookie molds, shortbread pans, and recipe booklets.  Hodgdon testified that the Natkiels gave her permission to use the copyrights and trademarks in an oral agreement prior to the end of the parties' business relationship.  I find Hodgdon's testimony credible.[7]

The Natkiels purported to have authority to grant Hodgdon permission to use HDI's copyrights and trademarks in the draft license agreements.  Although the Plaintiff contends that the

_____

[7]Except as otherwise stated, I find the defendants' testimony more credible in instances where the testimony at the injunction hearing was conflicting.

Natkiels made it clear that the parties had no business relationship before a written agreement was executed, they must have known that Hodgdon was creating BROWN BAG products prior to entering a written agreement because Hodgdon was producing those products at the Hill facility. Indeed, the Natkiels made the first set of cookie molds for Hodgdon.

In the typical copyright infringement case, a plaintiff must prove copying by showing that the defendant had access to the plaintiff's copyrighted work and that defendant's work is "substantially similar" to this material. Gamma Audio, 11 F.3d at 1115.

> [P]roof by direct evidence of copying is generally not possible since the actual act of copying is rarely witnessed or recorded. Normally, there is no physical proof of copying other than the offending object itself.

Id. at 1114 (quoting Concrete Machinery Co. v. Classic Lawn Ornaments, 843 F.2d 600, 605 (1st Cir. 1988)).

In stark contrast to the typical infringement case, here the evidence shows that the Natkiels were fully aware that Hodgdon was creating products using the Plaintiff's copyrights. Hodgdon testified that Paul Natkiel encouraged her to cast and sell cookie molds under an oral agreement. Paul Natkiel directed

20

former customers to Hodgdon for fulfillment of orders and promised those customers that Hodgdon would fill their orders. The evidence shows that Hodgdon partially performed under the oral agreement by investing her labor, time, and financial resources in the production and sales of BROWN BAG products.

Hodgdon admits that she has not paid any royalties for her sales, but testified it was unclear to whom royalties should be paid because of the creditor's foreclosure on HDI's assets. I find this testimony credible. The evidence shows that Paul and Lucy Natkiel negotiated with Hodgdon in contemplation of entering into a license agreement separate from HDI. See Pl. Ex. 23; Df. Ex. H-I. These negotiations took place while the Natkiels were in negotiations with HDI's major creditor, which had already opted to foreclose on HDI's assets. Some of the BROWN BAG products that were entered into evidence have a copyright notice from HDI and others have a copyright notice from "Natkiel."[8] Hodgdon's confusion as to whom to pay royalties in light of the confusion over copyright ownership does not appear to be

---

[8]The copyright notices imprinted on the backs of the cookie molds stickered by Hodgdon vary. A copyright notice from "Hill Design" is imprinted on Plaintiff's Exhibits 18 and 21. A copyright notice from "Natkiel" is imprinted on Plaintiff's Exhibits 19 and 20.

21

unreasonable.  In any event, Hodgdon's failure to pay royalties does not support Plaintiff's request for an injunction because there has been no showing of irreparable harm.

2.  The First Sale Doctrine

The Supreme Court held in Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 349-350 (1908), that a copyright holder's exclusive right to sell copyrighted works only applies to the first sale of the copyrighted work.  The first sale doctrine was endorsed by Congress in the Copyright Act of 1976 and codified in the United States Code.  See 17 U.S.C. § 109(a) (providing that the owner of a particular copy that was lawfully made is entitled, without the copyright owner's authorization, to sell or otherwise dispose of that copy); see also, Quality King Distrib., Inc. v. L'Anza Research Int'l, Inc., 523 U.S. 135 (1998) (finding that the first sale doctrine applies to imported copies).

The evidence presented at the injunction hearing showed that Plaintiff's infringement claims are not likely to succeed in part because of the first sale doctrine.  The first two categories of BROWN BAG items that Hodgdon sold were items that Hodgdon claims she made at the Hill facility with the Natkiels' permission, and items that Hodgdon collected over the years.  If Hodgdon's

testimony is credited, and it is accepted by this Court for the purposes of this report, the first sale doctrine renders Hodgdon's sales lawful.

The third category of items that Hodgdon sold were items from the Helen Ross Inventory. Those items no longer belonged to Plaintiff after Plaintiff sold them to Helen Ross. Therefore, the first sale doctrine would also apply to prevent Plaintiff from restricting the resale of those items.

This Court does not find that Hodgdon had any right to take and sell the items in the Helen Ross Inventory. It is entirely possible that Ms. Ross has a cause of action against Hodgdon. But Ms. Ross is not a party to this lawsuit. The Court finds, therefore, that the Plaintiff is unlikely to succeed on a claim that Hodgdon has infringed its copyrights and trademarks by selling the BROWN BAG items that she made with the Natkiels' permission, collected over the years, or obtained from the Helen Ross Inventory.

3. <u>Allegation of Hodgdon's Planned Future Infringement</u>

Plaintiff argues that it is entitled to a preliminary injunction because Hodgdon is preparing to mass produce unauthorized BROWN BAG products with the equipment that she has

23

in Danbury. Hodgdon denies Plaintiff's allegation. I find that Plaintiff's allegation is not supported by the evidence.

Hodgdon testified that she has not poured any BROWN BAG molds since she vacated the Hill facility in April 2002. Hodgdon testified that she does not have any working molds, and that as of the date of the injunction hearing she has not used the kilns that she purchased for AIC. Hodgdon claims that she has no intention to make any additional BROWN BAG products.

The Court finds that the Plaintiff has not demonstrated that Hodgdon has the capacity or the inclination to produce any additional BROWN BAG cookie molds. The Court further finds that the Plaintiff has not demonstrated that there is a basis for enjoining Hodgdon from selling the BROWN BAG items that Hodgdon produced with the Natkiels' permission or otherwise acquired as discussed herein.

4. <u>Unfair and Deceptive Acts</u>

Plaintiff contends that even if this Court determines that HDI has not established that Hodgdon converted its property, Plaintiff is entitled to injunctive relief based on the undisputed evidence that Hodgdon placed "HAND CAST by Art In Cooking" stickers on the backside of the cookie molds that she

24

made and sold after April 11, 2002. It is also undisputed that Hodgdon placed stickers that state "Distributed by Art In Cooking . . . ." on the back of the recipe booklets attached to the cookie molds. The stickers placed on the back of the recipe booklets completely cover HDI's copyright notice.

Plaintiff contends that Hodgdon's placement of stickers on the cookie molds and recipe booklets constitute unfair competition under § 43(a)(1) of the Lanham Act. See 15 U.S.C. § 1125(a)(1).[9] Plaintiff cites cases from several jurisdictions for the proposition that an unfair competition violation may be based on the defendant's misleading representations that create a potential for confusion regarding the source of the goods or the

---

[9]The statute provides in relevant part that:

> any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, . . . for any false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which --

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is likely damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

25

defendant's apparent authorized affiliation with the plaintiff or the plaintiff's goods. See, e.g., Johnson v. Jones, 47 U.S.P.Q. 2d 1481, 1488 (6th Cir. 1998); Montgomery v. Noga, 168 F.3d 1282, 1301 (11th Cir. 1999); U.S. Media Corp., Inc. v. Eddie Entm't Inc., 40 U.S.P.Q. 2d 1581, 1588-89 (S.D.N.Y. 1996); Playboy Enter., Inc. v. Frena, 839 F. Supp. 1552, 1562 (M.D. Fla. 1993); see also, McCarthy on Trademarks and Unfair Competition § 27:9 (4th ed. 2002).

Plaintiff contends that in the instant case, the stickers that Hodgdon placed on the BROWN BAG molds and recipe booklets at issue are misleading and cause a potential for confusion regarding the source and origination of the goods. Plaintiff argues that the "HANDCAST BY Art in Cooking" stickers are a misrepresentation because the molds sold with these stickers were cast by Hodgdon at the Hill facility, not AIC. The Court finds this argument unpersuasive.

The relevant fact about the production of the molds is that Hodgdon, and not HDI or the Natkiels, cast the molds to which Hodgdon affixed the handcast stickers. Hodgdon testified that productions runs cast by the Natkiels resulted in a loss because they were not of first quality. The undisputed evidence is that

26

Hodgdon thereafter cast all subsequent molds by herself for her sole proprietorship, which was later incorporated. The Court finds no basis for granting an injunction because of Hodgdon's placement of "HANDCAST BY Art In Cooking" stickers on the backs of the molds Hodgdon cast.

With respect to the stickers that Hodgdon placed on the backs of the recipe booklets attached to the molds, the Court finds that the Plaintiff has a legitimate argument. The stickers that Hodgdon placed on recipe booklets suggest an ongoing affiliation between AIC and HDI that was no longer the case after April 11, 2002. The stickers are also potentially confusing because Hodgdon placed them directly over HDI's copyright notice. The Court finds that Hodgdon should be enjoined from obstructing HDI's copyright notices on the HDI items she owns and resells, and enjoined from placing stickers on those items indicating that they are "distributed by Art In Cooking."

C.    Irreparable Harm

In copyright and trademark infringement cases, there is a presumption that infringement causes irreparable harm. See, e.g., Am Bd. of Psychiatry and Neurology, Inc. v. Johnson-Powell, 129 F.3d 1, 4 (1st Cir. 1997); Societe Des Produits Nestle, S.A.

27

v. Casa Helvetia, Inc., 982 F.2d 633, 640 (1st Cir. 1992); Concrete Machinery, 843 F.2d at 611; Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697 (1st Cir. 1987). The Court finds that the Plaintiff is entitled to a presumption of irreparable harm based on Hodgdon's placement of potentially confusing stickers on the BROWN BAG recipe booklets. Hodgdon made no showing that rebuts that presumption.

D. Balance of the Hardships

The Court finds that any hardship that Hodgdon would suffer as a result of the limited injunctive relief recommended herein is minimal. Hodgdon has not argued or demonstrated that her efforts to sell her BROWN BAG items would be diminished in any way without placing potentially confusing stickers on the BROWN BAG recipe booklets.

E. Public Interest

The Court must consider the impact that a preliminary injunction would have on the public interest. Trademark and unfair competition laws protect the public by providing a means to minimize the confusion consumers may experience in attempting to obtain desired goods and services. DeCosta, 981 F.2d at 605. I find that the public interest would not be adversely affected

28

by granting the Plaintiff limited injunctive relief.

F.    <u>Preliminary Injunction Bond Requirement</u>

Under Rule 65 of the Federal Rules of Civil Procedure, the Court must require an applicant for a preliminary injunction to give security in a sum that the Court determines is proper to pay the costs and damages of any wrongfully enjoined party.  I find that the potential cost and damages to Hodgdon caused by the form of injunctive relief recommended in this report is insignificant.  I recommend that no bond requirement be set.

<u>CONCLUSION</u>

Based on the evidence presented at the injunction hearing, and the relevant authorities, I recommend that the Plaintiff's motion for preliminary injunction (document no. 3) be granted in part and denied in part.  I recommend that the Court issue the following order:

> Pending a final determination on the merits in this case, Vivian Hodgdon and Art In Cooking, Inc., together with their agents, affiliates, subsidiaries and any person in active concert with or participation with them, are hereby enjoined and restrained from suggesting or implying that they have an ongoing business relationship with the Plaintiff unless expressly authorized to do so in writing, and are enjoined and restrained from obstructing or obscuring the Plaintiff's copyright notice in connection with the sale, promotion, advertising, or offering of items made by Vivian Hodgdon at the Hill facility, or obtained by

Hodgdon through other sources.

I recommend that Plaintiff's request for a preliminary injunction be denied in all other respects.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date: April 7, 2003

cc:    David P. Eby, Esq.
       Vivian Hodgdon, pro se